Case No.: 3:25sw123



FILED
May 30 2025
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Tiffani L. Corley, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I am a law enforcement officer within the meaning of Title 18, United States Code, § 2510(7), that is an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, § 2516.

2.      I am presently employed as a Special Agent ("SA") for the United States Drug Enforcement Administration ("DEA"). I have been employed full-time by the DEA since March 2005 and I am currently assigned to the Richmond District Office ("RDO").

3.      Prior to becoming an agent, I completed the DEA Basic Agent Training course in Quantico, Virginia, a seventeen-week intensive drug law enforcement-training program. DEA training focuses on, among other things: confidential informant (CI) management, interviews of suspects and defendants, report writing, physical and electronic surveillance, tactics, the preparation of wiretap affidavits and search warrants, and drug identification. After graduation, I successfully completed a sixteen-week field-training program at my first office of assignment. During my time as a Special Agent, I have participated in investigations involving the unlawful importation, exportation, manufacture, possession with intent to distribute and distribution of narcotics, the laundering of narcotics proceeds, monetary instruments derived from narcotics activities, and conspiracies associated with narcotics offenses. I have participated in numerous narcotics investigations with more experienced SAs and Task Force Officers ("TFOs") within DEA.

4. Through my training, experience, and interaction with other more experienced SAs, TFOs, and other narcotics investigators, I have become familiar with the methods employed by narcotics trafficking organizations to smuggle, safeguard, and distribute narcotics, and to collect and launder narcotics related proceeds. These methods include (but not limited to) the use of debit calling cards, public wifi hotspots, wireless communications technology (such as smartphone apps, voice over ip phones, and cellular telephones), counter surveillance, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious identities and coded communications in an attempt to avoid detection by law enforcement and circumvent narcotics investigations.

5. I have been involved in the preparation and service of state and federal search warrants at numerous locations throughout the United States of America. At many of the locations, I have seized controlled substances including (but not limited to) cocaine, methamphetamine, MDMA, heroin, and marijuana. I have also seized many items of non-drug evidence, which include vehicles used to facilitate drug trafficking, narcotics proceeds, drug pay and owe sheets, telephone directories and toll records. I have interviewed many of the suspects at these locations, and I have learned of the methods and operations of the drug trafficking organizations.

6. In December 2010, I received eight hours of California state wiretap training, analyzing phone tolls, writing and serving subpoenas, writing both state and federal affidavits, analyzing line sheets for pertinent criminal information, and minimization. I have also participated in several state and federal wiretaps in the capacity of presenting evidence to magistrates for sealing, monitoring phone lines, and writing 6-day reports.

7.  In addition, I am familiar with narcotic traffickers' methods of operation including the distribution, storage, and transportation of narcotics, the collection of money that represent the proceeds of narcotics trafficking, and money laundering. I am aware narcotics traffickers often communicate with their drug trafficking associates through the use of many communications devices such as: home telephones, cell phones, and social media applications. I am aware drug traffickers will often change cellular telephones and account screen names to avoid detection by law enforcement. It has been my experience that narcotics traffickers will also use cellular telephones, and social media web sites that are not subscribed to their own names or addresses; as well as change these accounts frequently. They do this in order to avoid detection by law enforcement.

8.  It has been my experience that narcotics traffickers will also use registered vehicles, utilities, cellular telephones, and social media web sites that are not subscribed to their own names or addresses. They do this in order to avoid detection by law enforcement.

9.  I have interviewed numerous criminals regarding the transportation and sales of narcotics. During many of these investigations, the criminals have admitted to their utilization of telephones, social media web sites, the utilization of stash locations, and methods of distribution. I know from my training and experience in the field of narcotics that subjects involved in the crimes of possession for sales and transportation of controlled substances will often utilize telephones and social web pages to arrange their crimes or coordinate with co-conspirators.

10. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

11. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21 U.S.C. §§ 841(a)(1) and 846, to wit: distribution and possession with intent to distribute of Schedule I and II controlled substances, and conspiracy to distribute and possess with intent to distribute Schedule I and II controlled substances, have been committed by William BROWN (BROWN) and Litia THOMAS (THOMAS). There is also probable cause to search the information described in Attachment A, incorporated by reference herein, for evidence of these crimes, as specifically described in Attachment B, incorporated by reference herein.

## JURISDICTION

12. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Eastern District of Virginia is a district court of the United States that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

13. Since early 2024, DEA Richmond, Virginia State Police, and Richmond Police Department have been investigating the drug trafficking organization lead by William BROWN. Your affiant has meet with several detectives and cooperating sources that confirmed that BROWN is a multi-kilogram narcotics distributor in the Richmond metropolitan area. Based on information provided by the Virginia Department of Motor Vehicles ("DMV"), BROWN is known to reside at 10632 Sherwin Place, Glen Allen, Virginia 23059. NCIC records disclose **BROWN** has a criminal history of seven felony and two misdemeanor (misd.) convictions:

| Disposition Date | Location | Charges | Disposition |
|---|---|---|---|
| 01/18/2005 | Richmond City | Manufacture, sale, possession of controlled substance | Guilty – Felony |

| Disposition Date | Location | Charges | Disposition |
|---|---|---|---|
| 04/18/2005 | Richmond City | Possession of controlled substance | Guilty – Felony |
| 03/10/2005 | Richmond City | Trespassing | Guilty – Misd |
| 03/10/2005 | Richmond City | Resisting Arrest | Guilty – Misd |
| 07/28/2005 | Richmond City | Manufacture, sale, possession of controlled substance | Guilty - Felony |
| 09/27/2007 | Richmond City | Drugs: Sale/provide for resale Sch I or II | Guilty – Felony |
| 09/27/2007 | Richmond City | Drugs: Sale/provide for resale Sch I or II | Guilty – Felony |
| 08/17/2015 | Richmond City | Firearm: Possession by felon non-violent w/in 10 years | Guilty – Felony |
| 08/17/2015 | Richmond City | Assault: On law enforcement / judge / doc / fire / emergency personnel | Guilty – Felony |

14.     According to DMV records, an associate of BROWN, Thomas Denzel ABERNATHY resides at 3633 Ghent Drive, Chesterfield, Virginia 23832. NCIC records disclose ABERNATHY has a criminal history of three felony and one misdemeanor (misd.) convictions:

| Disposition Date | Location | Charges | Disposition |
|---|---|---|---|
| 08/13/2018 | Richmond City | Firearm: Display while selling Sch I, II | Guilty - Felony |
| 08/13/2018 | Richmond City | Drugs: Possession with intent to manufacture / sell Sch I, II | Guilty – Felony |
| 08/13/2018 | Richmond City | Drugs: Possession with intent to manufacture / sell Sch I, II | Guilty – Felony |
| 04/10/2015 | Chesterfield County | Concealed Weapon: Carry | Guilty - Misd |

15.     Based on DMV information, Litia THOMAS also resides at 10632 Sherwin Place, Glen Allen, Virginia 23059.  THOMAS is the girlfriend/significant other of BROWN. NCIC records disclose THOMAS has one felony conviction:

| Disposition Date | Location | Charges | Disposition |
|---|---|---|---|
| 10/31/2013 | Chesterfield County | Drugs: sell/provide for resale sch I or II | Guilty – Felony |

16. On February 21, 2025, at 10:12 PM, investigators observed, via pole camera, a silver Toyota Camry back into a parking spot in front of a storefront located at 3819 Walmsley Boulevard, in Richmond, Virginia 23234. This vehicle had previously been identified as a rental vehicle, rented by Trent TROWELL bearing the Florida license plate 85BNYL. TROWELL is a close associate of BROWN and based on their patterns of movement and speaking with confidential sources, your affiant believes to be part of BROWN's drug trafficking organization. Upon parking, investigators observed a black male, believed to be BROWN, exit the door of 3819 Walmsley and enter TROWELL's front passenger seat. Investigators were able to view inside the cabin of the vehicle due to a dome light being activated by the driver. Inside the vehicle, investigators observed the driver reach into the rear seat and place a bag on the passenger's lap, then reach over and handle the bag in the passenger's possession. After a short duration, investigators observed BROWN give the driver the bag back, after which the driver placed the bag in the rear seat of the vehicle. Investigators then observed the passenger making repetitive hand movements as if counting money, then hand a small object reminiscent of a stack of U.S. currency to the driver. At 10:16 PM, investigators observed the passenger exit the Toyota Camry and the vehicle depart.

17. Investigators did not observe BROWN holding anything when he exited 3819 Walmsley to get into TROWELL's vehicle. Based on experience and the observed movements within TROWELL vehicle, investigators believe this was a bulk money exchange between BROWN and TROWELL.

18. On March 14, 2025, at 11:28 PM, investigators observed, via pole camera, a Black Jeep Grand Cherokee bearing Illinois license plate FP253302 at 3819 Walmsley Boulevard. Investigators queried the Illinois DMV and determined that the vehicle was a rental through AVIS.

AVIS records identified the renter as William BROWN. On March 18, 2025, at 9:57 PM, investigators observed the same vehicle arrive at a single-family, detached house located at 1717 Hopkins Road, Richmond, Virginia 23224, and park at the rear of the residence. Investigators have been watching this location for several months via spot checks and poll camera footage. The activity at 1717 Hopkins Road is not consistent with typical residents' activity, as none of the target subjects actually live there. Most of the activity at this location is TROWELL and ABERNATHY, who only park behind the residence out of view from the street. BROWN and other close narcotics associates have been seen at the residence for short periods at a time. On the evening of April 22, 2025, ABERNATHY (based on phone location data) made an overnight road trip to the state of New York. Based on phone location data ABERNATHY was stationary for less than one hour before returning to Virginia. When ABERNATHY returned from New York he removed a heavily weighted bag from the rear of the vehicle and walked towards the house. That was the first-time investigators observed anyone staying overnight at 1717 Hopkins Road in several months. Based on your affiant's training and experience and my knowledge of the activity at 1717 Hopkins Road, I believe this residence is being used as a narcotics stash location.

19. In May 2025, your affiant received information from a reliable confidential source ("CS") that THOMAS had requested the CS to rent properties for BROWN. The CS stated that THOMAS contacted the CS using Instagram messenger using the screenname "gigimommy__". Your affiant reviewed the Instagram page as well as the driver's license of THOMAS and confirmed the photos posted on the page and the photo in the driver's license are the same person. The CS stated that the Instagram messenger voice call from "gigimommy__" is how THOMAS contacted the CS on several occasions. The CS stated that he/she is often contacted by known narcotics distributors to rent properties because the narcotics distributors are attempting to hide

any real identity to the location they are trying to lease. Based on my training and experience narcotics distributors often recruit others to use their names or fictitious names in order to thwart law enforcement as well as to support their denying any link to the property.

20. Just weeks prior to the CS being requested to provide an identity for a residence, surveillance at 3819 Walmsley indicated that a moving truck was there moving large pieces of furniture from the storefront. Activity at 3819 Walmsley also has stopped and agents have not seen any associates of BROWN in and out of that location since. Based on my training and experience I believe BROWN has moved out of the 3819 Walmsley storefront narcotics stash location and is looking for alternative residences to use as stash locations. I believe THOMAS is working on behalf of BROWN to find locations to use as stash locations and to hide their real identities, and therefore identify her as a co-conspirator.

21. A preservation request has been sent to Instagram for the target account.

## BACKGROUND CONCERNING INSTAGRAM[1]

22. Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

---

[1] The information in this section is based on information published by Meta on its Instagram website, including, but not limited to, the following webpages: "Data Policy," https://help.instagram.com/519522125107875; "Information for Law Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

23. Meta collects basic contact and personal identifying information from users during the Instagram registration process. This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers. Meta keeps records of changes made to this information.

24. Meta also collects and retains information about how each user accesses and uses Instagram. This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

25. Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

26. Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service. Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

27. Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

28. Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users. Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions. Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

29. Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings. Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

30. One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

31.  Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

32.  An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

33.  Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

34.  Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

35. Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

36. Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Meta retains records of a user's search history and followed hashtags.

37. Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

38. Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content. Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers. This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

39. In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support

services, as well as records of any actions taken by the provider or user as a result of the communications.

40. For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

41. Request is being made for all voice calls and message call records that are contained in the messaging application. In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

42. For example, the stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, voice messages, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

43. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of

who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

44. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

45. Other information connected to the use of Instagram may lead to the discovery of additional evidence. For example, associated and linked accounts, stored communications, photos, and videos may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, stored communications, contact lists, photos, and videos can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

46. Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

47.     Based on the forgoing, I request that the Court issue the applied for search warrant to search the account identified in Attachment A, incorporated by reference herein, for the evidence, fruits and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846, as specifically described in Attachment B, incorporated by reference herein.

48.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____
Tiffani L. Corley
Special Agent
DEA

Subscribed and sworn to before me this 30th day of May, 2025, in Richmond, Virginia

/s/ MRC
_____
Hon. Mark R. Colombell
United States Magistrate Judge

## ATTACHMENT A

### Place to Be Searched

This warrant applies to information associated with the Instagram username "gigimommy__" that is stored at premises owned, maintained, controlled, and/or operated by Meta, a company headquartered at 151 University Avenue, Palo Alto, California, 94301.

## **ATTACHMENT B**

### **Particular Things to be Seized**

**I.   Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a) All contact information, including full name, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All Photoprints, including all photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

(c) All Neoprints, including friend lists; groups and networks of which the user is a member; "News Feed" information; "Wall" postings; "Notes"; status updates; links to videos, photographs, articles, and other items; event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

(d) All other communications and messages made or received by the user, including all private messages and pending "Friend" requests;

(e) All IP logs;

(f) All information about the user's access and use of Facebook Marketplace;

 (g) The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

 (h) All privacy settings and other account settings;

 (i) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**II.** **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of the statutes listed on the warrant involving William BROWN (BROWN) and Litia THOMAS (THOMAS) since January 2024, including, for each user ID identified on Attachment A, information pertaining to the following matters:

 (a) The sale of illegal narcotics

 (b) Records relating to who created, used, or communicated with the user ID.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Facebook, and my official title is _____. I am a custodian of records for Facebook. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Facebook, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b. such records were kept in the ordinary course of a regularly conducted business activity of Facebook; and

c. such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____     _____
Date                                Signature